**WO** SC

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF CALIFORNIA

Mario Martinez,) No. CV 1-08-01459-MHM
)
    Plaintiff,) **ORDER**
)
vs.)
)
Ted McDow, et al.,)
)
    Defendants.)

Plaintiff Mario Martinez, who was then-confined in the Pleasant Valley State Prison (PVSP) in Coalinga, California, filed a *pro se* civil rights Complaint pursuant to 42 U.S.C. § 1983.[1] (Doc.# 1.)[2] Plaintiff was subsequently released and retained counsel.[3] The Court will order Defendants McDow and Kresda to answer Count I of the Complaint and will dismiss the remaining claim and Defendants without prejudice.

**I.**    **Statutory Screening of Prisoner Complaints**

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or an officer or an employee of a governmental entity. 28 U.S.C.

---

[1] This case was reassigned to the undersigned on November 25, 2008.

[2] "Doc.#" refers to the docket number of filings in this case.

[3] Although Plaintiff was granted leave to proceed *in forma pauperis* while a prisoner, since his release, he has paid the filing fee in full.

JDDL

1  § 1915A(a). The Court must dismiss a complaint or portion thereof if a plaintiff has raised
2  claims that are legally frivolous or malicious, that fail to state a claim upon which relief may
3  be granted, or that seek monetary relief from a defendant who is immune from such relief.
4  28 U.S.C. § 1915A(b)(1), (2).

**II.  Complaint**

Plaintiff alleges deliberate indifference to his serious medical and dental needs and threats to his safety while he was incarcerated at the Sierra Conservation Center (SCC). He sues: Ted McDow, D.D.S., a dentist at SCC; Robert Stogsdill, D.D.S., the Chief Dental Officer at SCC; Jack St. Clair, M.D., the Chief Medical Officer at SCC; the SCC Warden; the Secretary/Director of the California Department of Corrections and Rehabilitation (CDCR); Jill Knesda, a dental nurse; Does I-V, any and all successors of Defendant Director/Secretary; and Does VI-XX, other CDCR employees responsible for medical/dental care of inmates at SCC. Plaintiff seeks declaratory, injunctive, compensatory, and punitive relief.

Plaintiff alleges the following facts in his Complaint: On July 5, 2007, Plaintiff went to the Tuolumne Dental Clinic at SCC regarding swelling around a tooth.[4] Dr. McDow told Plaintiff the tooth and his sinus cavity were infected and decided to pull the tooth. In doing so, Dr. McDow used a drill bit "in an unauthorized manner . . . to pull out the roots of the tooth." (Doc.# 1 at 8.) Dr. McDow observed a hole in Plaintiff's sinus cavity after removal of the infected tooth, but continued using the drill bit as a pry. Plaintiff told Dr. McDow that he could feel air going through the hole every time he took a breath, but he was sent back to his unit. An hour later, Plaintiff returned because he was not getting enough oxygen. According to Plaintiff, Dr. McDow's supervisor, who is not identified, told Dr. McDow to make a clay model of Plaintiff's mouth and send it to the supervisor so that the supervisor could make a cover, akin to dentures, to cover the hole. The supervisor also told Dr. McDow to stitch up the hole. After Dr. McDow made the clay model, Plaintiff was in pain and "felt

---

[4] By that time, Plaintiff had been complaining for a year of a toothache, only to be told by clinic personnel that nothing was wrong.

like something was poking him [and] felt like his face was on needles and that his mouth was filling up with air like a balloon causing him to feel dizzy." (Id. at 9.) Dr. McDow told Plaintiff the removal of the infected tooth and the infection in his sinus cavity caused the sensations and pain. Dr. McDow also told Plaintiff that a plate to cover the hole was on its way, that he would shoot foam into the hole for the infection, and that he would stitch up the hole. Dr. McDow refused, however, to give Plaintiff antibiotics or medicine for the pain, telling Plaintiff that he should still be too numb to feel any pain. Dr. McDow also told Plaintiff that the swelling would go down within three hours and that the plate and stitches should stop air flow through the hole. Plaintiff told Dr. McDow he was in pain and that something was poking him in the sinus area. Dr. McDow explained that other parts of the jaw might have been affected by pulling the tooth.

Later that day, Plaintiff's face was still swollen and he was in "awful pain." (Id. at 10.) Plaintiff attempted to eat soft food, but that made the pain worse. Plaintiff went to the medical clinic, but was told to go to the emergency line in the morning. Plaintiff was unable to sleep that night due to stabbing pain and, the next morning, when he blew his nose, blood and mucus were emitted. Plaintiff's face was even more swollen. Plaintiff reported to the dental clinic, where dental nurse Jill Knesda accused Plaintiff of "making all this up" and of being a hypochondriac and sent him out of the clinic. Sergeant Lloyd sent Plaintiff back to the clinic, where Dr. McDow saw him. Dr. McDow examined Plaintiff's mouth and said nothing was wrong. Dr. McDow prescribed antibiotics and pain medication despite telling Plaintiff there was no infection or pain. Dr. McDow told Plaintiff that he would see him in a week.

Plaintiff continued to suffer from severe pain and had an officer arrange for him to be seen at the clinic, where Medical Technician Assistant (MTA) Boatman saw him. Boatman examined Plaintiff's face, then called his supervisor and reported that Plaintiff's face was swollen and he was in a lot of pain. Boatman was instructed by his supervisor, after checking Plaintiff's file, that it was a dental problem and to put Plaintiff on sick call for the following morning. Plaintiff was unable to sleep that night due to the pain.

1 | The next day, Sergeant Dean pulled Plaintiff out of the line for chow hall and asked Plaintiff who had beaten him up because his face was so swollen. Plaintiff explained that his face was swollen after having a tooth extracted. Dean escorted Plaintiff to the dental clinic. There, Dr. McDow and Nurse Knesda told Plaintiff he needed to wait for the medications to take effect and that nothing was wrong. Plaintiff asked that x-rays be taken, but they refused. Over the next two days, officers repeatedly questioned Plaintiff about whether he had been beaten up because his face was swollen and Plaintiff repeatedly explained the circumstances.

On July 9, 2007, Plaintiff was notified that he was being transferred for medical reasons. Because Plaintiff had recently received a clean bill of health, his counselor, Reggie Krammer, called the medical department to find out the reasons for a medical transfer. Defendant St.Clair apparently informed Krammer that Plaintiff was being transferred because he complained so much about his sinus cavity and pain and the dental clinic was "tired" of his complaints. St. Clair apparently also told Krammer that Plaintiff would not be transferred if he sought mental help and started taking pills for his condition.

On July 11, 2007, Plaintiff blew his nose, which caused bleeding from his nose to increase. As he walked to the chow hall, he was again questioned about whether he had been assaulted due to his swollen face. Sergeant Dean informed his lieutenant of Plaintiff's situation. MTA Boatman subsequently saw Plaintiff and attempted to get assistance for him and provided Plaintiff with a liquid meal because Plaintiff was unable to eat. The pain increased and blood and pus leaked from Plaintiff's nose.

The next day, Officer Chang questioned Plaintiff about whether he had been assaulted and Plaintiff explained his situation. Chang got Plaintiff into the dental clinic, where Dr. McDow again told Plaintiff nothing was wrong. By that time, Plaintiff was in tears from unbearable pain. Dr. McDow then took an x-ray, which revealed a foreign object in Plaintiff's sinuses. After learning that Plaintiff had never had a broken jaw or pins inserted in his face, Dr. McDow said that he would send Plaintiff for x-rays. Plaintiff informed Dr. McDow that no foreign object had been present when his face was x-rayed four months

- 4 -

JDDL

earlier. Plaintiff was sent back to his building, but subsequently returned to Dr. McDow's office, where he overheard Dr. McDow on the telephone discussing "something" that had been missing and that he had found the missing "piece" in Plaintiff's face." (Id. at 14.) A nurse came in and told McDow that Plaintiff was there listening to everything. Dr. McDow told Plaintiff he was glad that he was there and examined Plaintiff's jaw. He gave six shots to numb Plaintiff's mouth. He cut the roof of Plaintiff's mouth and pulled the flesh down causing Plaintiff to jump out of the chair in pain. Dr. McDow told Plaintiff to sit down and he would stitch him up. Dr. McDow took another x-ray and told Plaintiff the foreign object was no longer there. Dr. McDow did not tell or show Plaintiff the foreign object, but told him that he would not be getting further x-rays because the object was gone. Plaintiff told Dr. McDow that something was still wrong and that the pain had increased, but Dr. McDow sent him back to his unit.

On July 13, 2007, Plaintiff was ordered to report back to the dental clinic right away, where Dr. McDow told Plaintiff that a set of x-rays were going to be done after all. The x-rays revealed that the foreign object had not been removed but had instead been pushed up higher. Plaintiff could see the object in the x-rays and overheard staff discussing it. Plaintiff returned to the yard in great pain. Sergeants Dean and Lloyd then approached Dr. McDow and told him that Plaintiff needed medical attention because his face was getting worse. Shortly thereafter, Plaintiff was transported to Doctors Hospital of Manteca. There, Plaintiff was informed by an officer that a drill bit had been left in his face and that a medical team was there to operate to remove it. Plaintiff requested a second opinion. Dr. Jennings explained the procedure to be performed and that Plaintiff's life was at risk if the procedure was not performed. Dr. Jennings operated to remove the object and told Plaintiff that he could see how Dr. McDow had "covered it up." (Id. at 16.) Dr. Jennings further told Plaintiff that Dr. McDow had made matters worse by attempting to retrieve the bit. He also informed Plaintiff that he might suffer pain, numbness, and other problems for the rest of his life. Plaintiff alleges that his jaw and part of his face are now numb, he is in constant pain, he suffers tingling sensations, his sense of taste comes and goes, and he has difficulty eating

1  and swallowing because of nerve damage caused by Dr. McDow's acts and omissions.

**III.   Failure to State a Claim**

To state a claim under § 1983, a plaintiff must allege facts to support that (1) the conduct about which he complains was committed by a person acting under the color of state law and (2) the conduct deprived him of a federal constitutional or statutory right. Wood v. Ostrander, 879 F.2d 583, 587 (9th Cir. 1989). In addition, to state a valid constitutional claim, a plaintiff must allege that he suffered a specific injury as a result of the conduct of a particular defendant and he must allege an affirmative link between the injury and the conduct of that defendant. Rizzo v. Goode, 423 U.S. 362, 371-72, 377 (1976).

**A.   Does I-XX**

Plaintiff sues Doe Defendants I-XX, without differentiating how any particular fictitiously named Defendant allegedly violated his constitutional rights. Generally, the use of anonymous type appellations to identify defendants is not favored. Rule 10(a) of the Federal Rules of Civil Procedure requires the plaintiff to include the names of the parties in the action. As a practical matter, it is impossible in most instances for the United States Marshal or his designee to serve a summons and complaint or amended complaint upon an anonymous defendant.

The Ninth Circuit has held that where identity is unknown prior to the filing of a complaint, the plaintiff should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover the identities, or that the complaint would be dismissed on other grounds. Wakefield v. Thompson, 177 F.3d 1160, 1163 (9th Cir. 1999) (citing Gillespie v. Civiletti, 629 F.2d 637, 642 (9th Cir. 1980)). Plaintiff may use the discovery processes to obtain the names of the persons whom he believes violated his constitutional rights. If Plaintiff discovers the identities of these fictitious defendants through the discovery process, or otherwise, he may seek leave of the Court to amend to name these individuals.

**B.   CDCR Secretary, CSP Warden, Stogsdill, and St. Clair**

Plaintiff also sues the CDCR Secretary, the CSP Warden, and Drs. Stogsdill and St.

Clair. Although each may be properly sued for constitutional violations, Plaintiff fails to state a claim against any of them. "A plaintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights." Barren v. Harrington, 152 F.3d 1193, 1194 (9th Cir. 1998). For an individual to be liable in his official capacity, a plaintiff must allege that the official acted as a result of a policy, practice, or custom. See Cortez v. County of Los Angeles, 294 F.3d 1186, 1188 (9th Cir. 2001). Further, there is no *respondeat superior* liability under § 1983, so a defendant's position as the supervisor of a someone who allegedly violated a plaintiff's constitutional rights does not make him liable. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978); Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). A supervisor in his individual capacity, "is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." Taylor, 880 F.2d at 1045.

Plaintiff fails to allege facts to support that the Secretary, the Warden, or Stogsdill enacted or enforced a policy, custom, or practice that resulted in the violation of Plaintiff's constitutional rights. Further, Plaintiff has not alleged facts to support that any of them directly violated his constitutional rights or that any of them were aware that Plaintiff's rights were being violated but failed to act. Plaintiff merely predicates liability solely on *respondeat superior*, which is not sufficient to state a claim. As to Dr. St.Clair, Plaintiff at most only alleges that Dr. St. Clair informed Plaintiff's counselor of the reasons why he was being considered for a transfer. Absent additional factual allegations, that does not support that St. Clair enacted or enforced a policy, custom, or practice that resulted in the violation of Plaintiff's constitutional rights, nor does it support that St. Clair was aware that Plaintiff's rights were being violated but failed to act. For the reasons discussed, Defendants Secretary, Warden, Stogsdill, and St. Clair will be dismissed.

### C. Threats to Safety

In Count II, Plaintiff alleges a failure to protect or threats to his safety based on the events alleged. Prison officials are required to take reasonable measures to guarantee the

safety of inmates and officials have a duty to protect prisoners from violence at the hands of other prisoners. Farmer v. Brennan, 511 U.S. 825, 832-33 (1994); Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998). To state a claim for threats to safety, an inmate must allege facts to support that he was incarcerated under conditions posing a substantial risk of harm and that prison officials were "deliberately indifferent" to his safety. Farmer, 511 U.S. at 834; Frost, 152 F.3d at 1128; Redman v. County of Los Angeles, 942 F.2d 1435, 1443 (9th Cir. 1991) (*en banc*). To adequately allege deliberate indifference, a plaintiff must set forth facts to support that a defendant knew of, but disregarded, an excessive risk to inmate safety. Farmer, 511 U.S. at 837. That is, "the official must both [have been] aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and he must also [have] draw[n] the inference." Farmer, 511 U.S. at 837; Frost, 152 F.3d at 1128; Redman, 942 F.2d at 1442.

Plaintiff adequately alleges facts to support that Defendants McDow and Kresda may have acted with deliberate indifference to his serious dental or medical needs;[5] but Plaintiff has not alleged facts to support that he was incarcerated under conditions posing a substantial risk of harm. Nor has he alleged facts to support that any named Defendant has acted with deliberate indifference to *conditions of confinement* that posed a substantial risk of harm.

---

[5] To state a claim for a constitutional violation regarding medical or dental care, a plaintiff must allege facts to support that he has or had a serious medical or dental need and that a particular defendant acted with deliberate indifference to that need. See Estelle v. Gamble, 429 U.S. 97, 104-05 (1976). "Deliberate indifference is a high legal standard." Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004). In the medical or dental context, deliberate indifference may be shown by (1) a purposeful act or failure to respond to a prisoner's pain or possible medical (or dental) need and (2) harm caused by the indifference. Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing Estelle, 429 U.S. at 104). Thus, deliberate indifference may occur if "prison officials deny, delay or intentionally interfere with medical treatment." Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988). Medical or dental malpractice or negligence, however, is insufficient to establish deliberate indifference. See Toguchi, 391 F.3d at 1060. Further, a difference in medical or dental opinion also does not amount to deliberate indifference. See id. at 1058. Rather, to prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course was medically (or dentally) unacceptable under the circumstances and was chosen in conscious disregard of an excessive risk to the prisoner's health. Id.

Accordingly, Count II will be dismissed.

**IV.    Claim for Which an Answer Will be Required**

Plaintiff adequately alleges facts to state a claim for deliberate indifference to his serious dental or medical needs against Defendants McDow and Kresda. These Defendants will be required to respond to Plaintiff's Complaint.

**V.    Warnings**

**A.    Address Changes**

Plaintiff must file and serve a notice of a change of address in accordance with Rule 83-182(f) and 83-183(b) of the Local Rules of Civil Procedure. Plaintiff must not include a motion for other relief with a notice of change of address. Failure to comply may result in dismissal of this action.

**B.    Copies**

Plaintiff must submit an additional copy of every filing for use by the Court. See LRCiv 5-133(d)(2). Failure to comply may result in the filing being stricken without further notice to Plaintiff.

**C.    Possible Dismissal**

If Plaintiff fails to timely comply with every provision of this Order, including these warnings, the Court may dismiss this action without further notice. See Ferdik v. Bonzelet, 963 F.2d 1258, 1260-61 (9th Cir. 1992) (a district court may dismiss an action for failure to comply with any order of the Court).

**IT IS ORDERED:**

(1)    Count II and Defendants Secretary, Warden, Stogsdill, St. Clair, and Does I-XX are **dismissed** without prejudice.

(2)    Defendants McDow and Kresda must answer Count I.

(3)    The Clerk of Court must send Plaintiff a service packet including the Complaint (doc.# 1), this Order, a Notice of Submission of Documents form, an instruction sheet, and copies of summons and USM-285 forms for Defendants McDow and Kresda.

(4)    Within **30 days** of the date of filing of this Order, Plaintiff must complete and

1 return to the Clerk of Court the Notice of Submission of Documents. Plaintiff must submit
2 with the Notice of Submission of Documents: a copy of the Complaint for each Defendant,
3 a copy of this Order for each Defendant, a completed summons for each Defendant, and a
4 completed USM-285 for each Defendant.

5     (5) Plaintiff must not attempt service on Defendants and must not request waiver
6 of service. Once the Clerk of Court has received the Notice of Submission of Documents and
7 the required documents, the Court will direct the United States Marshal to seek waiver of
8 service from each Defendant or serve each Defendant.

9     (6) **If Plaintiff fails to return the Notice of Submission of Documents and the**
10 **required documents within 30 days of the date of filing of this Order, the Clerk of Court**
11 **must, without further notice, enter a judgment of dismissal of this action without**
12 **prejudice.** See **Fed. R. Civ. P. 41(b).**

13 DATED this 12th day of May, 2009.

_____
Mary H. Murguia
United States District Judge